Good morning, your honors. I would reserve two minutes for rebuttal. My name is David Virginia. I'm with the Federal Defenders of Montana. Tony Gallagher is our executive director. We're here this morning, your honors, on two issues. One is that we believe the district court gave an enhancement under 3C1.1, which is obstruction of justice incorrectly. The We don't get to the reasonableness argument, your honors, if the court sides with our position on the enhancement, if the guidelines would be incorrectly scored. But with that, I give a notice this morning of U.S. v. Davenport. I'm sorry. That was a case that came out after the briefing in this. This is a case that involves both the receipt and the possession of child pornography. Well, the charge is possession or distribution, I think, wasn't it? Didn't it? Yes, your honor. The count eight, your honor? Yeah. Yeah. Count eight was possession and distribution, but he pled under the factual scenario to the possession during the period of the five previous receipts. So it's an all-encompassing from 2001 to 2005, your honor. I guess what I'm trying to get at is whether the factual basis for the plea included distribution, because it seems to me, although Davenport said that possession is a lesser included offense of receipt, I don't think that it said anything about distribution, which strikes me as not a lesser included. It didn't, your honor, and obviously you said on that panel. No, but the factual, what he gave the factual basis with in the plea colloquy was for the possession during the 2001 to 2005 period. His factual basis was for possession, your honor. We believe, though, because the advisory guidelines were then scored at 300 months and the statutory maximum was 240, that the consecutive sentence on count eight would fall because it would be factually not, it would be usurped by the Davenport decision. Of course, that is beyond the briefing and everything, but. It is, your honor, and if the court would like me to file a supplemental briefing, I certainly could. But the last thing, with the reasonableness argument, I would, I guess I would ask the court, is it ever reasonable to give a 65-year-old man who is in ill health, a first-time offender, 25 years for a nonviolent crime? But with that said, your honors, the obstruction, the 3C1.1, as the basis for this, as it comes down, I would ask the court to think in terms of the mens rea requirement, the willfulness of it. As the briefs point out, there is a factual timeline that's fairly important in this. On May 18th of 2005, a search warrant was executed at Mr. Williams' house. At that time, he went outside, sat in a car, fully confessed to the crime. After the police took the information from him and took the evidence, what they then did was take the computers to the forensic lab and count the pictures and see what the pictures were. Nothing then happened until April 21st of 2006, when he was indicted. At that point, a summons was issued, and it was executed. A deputy United States marshal actually served that on May 12th of 2006. At this point, we're one year later. On May 12th, he was told that he had to appear in court on May 15th. Mr. Williams chose to not appear. And he had never been arrested. Never been arrested, Your Honor. In fact, he wasn't arrested until July 25th, when he was arrested in North Carolina. The process is that on your initial appearance, you appear in front of the court, the magistrate reads the charge, tells you about the penalties, asks about your financial condition for an attorney, and then you are processed by the marshals when that process is over. That's if a court ever gives you a sentence, you get one day credit for that. That's the time of the arrest. The arrest would have occurred May 15th. I would ask the court to look to the excerpts of record on page 112A. That's the summons he received. There's nothing in there about failing to appear. So if one of the things that the government contends in their brief, in fact, the brief at page 16, he was fully aware of the nexus between not obeying the summons and the official proceeding. This is simply not true. There's nothing to give anybody any notice on a summons that if you don't appear, bad things can happen. But with that, almost a year goes by. The government, 3C1.1, works in this fashion. You can get the enhancement if you impede the administration of justice, either through the investigation, during the investigation, during the prosecution, or during the sentencing. Clearly this isn't a sentencing question. But the investigation is done. There's no other investigation that is done after the time that he fails to appear. The computer work has all been done. So it's during the prosecution. And that's what the government actually asserts in their brief at page 15. So what did he do? There's no record of anything that he's done except cost him a little bit of time. There's some money in transporting him from North Carolina back to Montana. But there's nothing else as far as anybody says that he's done to impede the process of the prosecution. I mean, even if it delayed prosecution, wouldn't that be obstruction? Well, it may be. But keep in mind the original timeline. This is an event that occurred in the early days of the trial. And then the summons is served three days prior to his court appearance. And then he's arrested 80 days after that. So in the big picture, Your Honor, with all due respect, the delay in the prosecution clearly rests with the government. They waited 11 months to indict him. They gave him three days' notice to get to court. He then took 80 days on his own. And there's no evidence that he did anything from the time that he left to the time that he was arrested to do anything to hide himself, change his appearance. He didn't use, he didn't empty out his accounts to gain extra money. He just simply got in his car and drove. That's what the record shows. I would point to the court to... Does Madera-Gallegos help you? I'm sorry? Madera-Gallegos, does that help you? It does, Your Honor. There's two points to that. In Madera-Gallegos, the husband and wife, prior to their arrest, the enhancement applied, and you wrote in that opinion, where people played cat and mouse with the police. They didn't in this point. And in fact, you specifically wrote, Your Honor, we declined to adopt a cramped reading of Note 4, Application Note 4, where there was an attempt to escape justice and not just the crime scene. Admittedly, he, the crime scene, this isn't hot. This is 11 months later, 12 months later, in fact, when he leaves. And so, but you're talking about an unsophisticated person who's never been dealt with the law before. And I think that that is the problem. I cite Teta, but I think that United States v. Bliss is actually a better case, and that's found at 430 Bedford, 640. It's a Second Circuit case. In that case, a gentleman was going across the Vermont border with his niece, having sexual relationships, taking pictures. The man leaves his house. He's not there. He comes back the next day, and his mom tells him, Please work here. They took a whole bunch of stuff. What he does then is he gets in his car and drives to the airport. He rents another car under his name, drives to California, parks the car at the airport in California, rents a second car under his own name. He then gets a job under his name, but tells his boss, You know, I think I'm going to start using this other name. Pay me under this other name. So he creates an alias. He then changes his weight, changes his hair. He creates an alias. And the Second Circuit ruled in that case that the defendant's flight itself was insufficient to support the application of the enhancement. And in fact, part of the thing is in the notice, this mens rea. This gentleman, Mr. Bliss, was on America's Most Wanted. There was a specific task force created to find him. Not the case in Williams. The Second Circuit said this distinction between merely avoiding or fleeing from the arrest and obstructing justice is somewhat imprecise. And courts generally rely on facts of the specific case. Further, the defendant's actions, which amounted to little more than simply disappearing to avoid arrest, fell short of what the Sentencing Commission contemplated. This was instinctual flight, Your Honors. This is a guy who served a summons, pulled to come to court, has no idea what's going on, and just left. It doesn't amount to willfully obstructing justice. And the government has Your Honors, as there's nothing in this record that couches Williams as an extraordinary case. And if you're going to hold the government to the application notes, application note 4 says, Conduct resulting in an enhancement under 3C1.1 ordinarily indicates that the defendant has not accepted responsibility. There may, however, be extraordinary cases in which the adjustment of both acceptance and obstruction apply. The Court gave him acceptance of responsibility here, as well as giving him the instruction, the obstruction. This isn't an extraordinary case. This is just the application for the guy who left. There is nothing in this case, Your Honors, with all due respect, that merits the obstruction of justice. He did nothing to do that. I see my time is running out. Thank you very much. Good morning, Your Honors. Eric Wolfe for the United States. May it please the Court. The government relies upon the plain language of the guidelines, which is binding. 4E says, if you willfully fail to appear The guidelines aren't binding. Well, I mean, for purposes of calculation. Get that out of your mind. I will try and repress it. You know, they put it in so severely that it's hard to repress. Willfully failing to appear as ordered for a judicial proceeding is obstruction of justice. Now, what have we heard from Mr. Merchant? He says, well, you know, an initial appearance, who's to know what that is? It's obviously a proceeding. It says that on the summons. TEDA involved an initial appearance. I've been to initial appearances. There's a judge there. It's a court proceeding, so that clearly counts. He then says this is instinctual flight. Let's just be clear about that argument. He hops in a 1989 Nissan Pathfinder and drives from Billings, Montana to North Carolina, where he's living in the Pathfinder. That's not instinctual flight. You don't get instinctual flight across nine states over two and a half months. That is willfully failing to appear at the arraignment. Well, I mean, he was told to appear for arraignment. And there was, what, eight, nine months that went by between the time he confessed and the time he got that notice. So during that time, I think it would be reasonable for him to believe that maybe things were going to go away. Well, then he gets this notice. And he'd never served time in prison before. He knows that this is a serious charge. He's scared. He gets in his car and runs. Right. Yeah. If he had run... Why isn't that instinctual? If he had run before he got the summons, Mr. Merchant's arguments would actually have some merit. Why would he run? Because all this time went by and he thought, maybe this thing's going to go away, you know. Where there's delay, there's hope sometime. But once he... I went in there. I'm just, you know, they came to me. I confessed. I showed them everything. I let them take what they wanted. And I didn't produce any of this. I just got it off the internet. So maybe they're going to leave me alone. I don't know. But what took so long to... I don't know. I don't know what took so long. I do know one... You have to know you were the prosecutor. Well, Ms. Hurd was the prosecutor. And there's nothing in the record that... Marsha Hurd, there's nothing in the record before the court that explains the delay, with one exception. Well, two exceptions. First of all, they get his computer. There are so many images on his computer that it's very difficult to process. There are hundreds of thousands. And they actually wind up doing a sampling to try and figure out how many images... You know, they'll just take a block and see how many child pornography images there are in that block. And then they just extrapolate from that. And that's recounted in the PSR. So that was one issue, that this was a much larger than... How long did that take to do? It can take a while. I don't actually know how long it takes, but there's a big backlog on... I mean, somebody sat there for nine months... For forensic examination of computers, there is a backlog. So that's one issue. The second issue is they received an allegation of hands-on abuse. And they interviewed him about that in March of 2006, and he denied it. And then a month and a half later is when he gets the summons. And at that point, he knows there's a court proceeding. I understand that he's scared. I understand that he wants to run. But once he gets that summons, and he willfully decides to drive from Montana to North Carolina, he is right in for E, under the plain language. The only type of fleeing from arrest that does not count is... I have to confess, Your Honor, I did not prepare reading that case. I don't think it's in his brief, although Mr. Merchant seemed to be familiar with it. The cases he's described... I decided that case probably before you were born. That would be before the guidelines. I do predate the guidelines, Your Honor. The cases described by Mr. Merchant, every single one of them that he described here... You're saying to me that you haven't read it. I'm sorry. I'm happy to file a brief about it. I'm joking. The cases he described are all cases that involve pre-indictment, pre-summons, flee from arrest. Once you get the summons, you know you're obstructing a proceeding. And obstruction of justice has always been, for over a century, tied to a proceeding. That's the original nature of obstruction. You have to be obstructing a proceeding. The guideline has since been loosened just a little bit in the most recent amendment, so that if you know there's going to be a proceeding, then it sort of slips in. But it's always tied to a proceeding. So when they catch you at the bank that you've just robbed, and you run away from them... This is Stroud in the Second Circuit. And you run away from them. That is not obstruction of justice. If you take them on a high-speed chase, that might be reckless endangerment. But that is not obstruction of justice. When you get the summons, you know there's a proceeding. That, if you hop in your Pathfinder and drive nine states away and don't tell anyone, that falls within 4E. What's the significance of that? I mean, if he just hadn't appeared like they stayed home in this plaza, wouldn't it be obstruction? It would be. You can have cases that are closer calls, where defendants really are confused, or they think that it's something their attorney can handle and that they don't need to be. This happens from time to time. It has to be willful. There's no question about willfulness here. He got the summons. And it's at PSR, I think it's PSR 71. He said the reason that he ran is he realized he was going to be in a lot of trouble. And so he takes off. The notion of instinctive flight, two months. Judge Newton has a question. What strikes me as the elephant in the room is the long sentence, which is, in effect, a life sentence. I find it extremely difficult to reconcile a life sentence with the objectives of the set out in the sentencing statute. And I would like to hear you explain how the objectives are accomplished. Okay. Without fully appreciating the advisory nature of the guidelines, let me just say. No, the statute tells you what the purposes are. Right. Look at the statute as the purpose of the sentencing. Tell me what purposes are accomplished. He is well within the statutory maximums for these offenses. The purposes of the statute. Don't tell me the number. Tell me the purposes of the statute. Can you do that? I am right to it. Under 3553A. What's that? Under 3553A. The sentence is available. That's one of the factors you consider. I asked you to look at the purposes of the sentencing statute that tells you authorizes  It says there are these purposes. You're familiar with that? Absolutely, Your Honor. His offense conduct, his nature and history. Tell me what the purposes are. Okay. I was going through the whole list of 3553A, but I will go to offense conduct. Okay. The purposes are just punishment. All right. Let's start with that. Sure. This is a bad thing. So he certainly deserves some punishment. Does he deserve 25 years? I don't know. It's very hard to tell. But that's for Congress to decide. I mean, Congress has decided. If that was the only fact that you could stop right there. Just punishment. Factor one. What's the next factor? Well, he wants to rely upon his age, but I don't think that gets him very far. I think the court can consider it. But why does he get a break? Because he's 64. Do we hit some period of time when somebody is 64 or 70 years old? Well, now you can look at child pornography, because if we give you any sentence at all, you're not likely to serve it out. You just get a free pass. Nobody's arguing that. Don't give us those extreme cases. But that's what will happen. If you say, oh, no. Is a guy this old, if he's locked up for 20 years, likely to commit the crime? No. If he's locked up for 10, is he likely to commit it? Recidivism is a big factor in any punishment. He should get the minimum. What? He should get the minimum. 10 years would be the minimum. A reasonable judgment would make an estimate. How long would this man be likely to commit this kind of crime? Not for the rest of his life. But there are other considerations under 35. What are they? General deterrence and unwarranted disparity. Judge Siebel recognized this was the largest collection of child porn he had ever seen. Hundreds of thousands of images. If he gets the minimum, how about the guy who gets 20 years who had a fraction of that much? Those are reasonable considerations. You can take that into account. It's unfair for him to get a break. Well, you know, the federal government is just feeling its way in this area. The federal government, until fairly recently, had only to deal with sex crimes on Indian reservations. And suddenly, the internet age plunges it into sex crimes of this character. And so the reaction is, well, hit him hard. But it doesn't make much sense. I mean, these are not violent crimes. Not very attractive. There is some danger, if they repeat it. But this totally puritanical reaction, heavens, we've got to stop it, and we'll wipe him out. That doesn't make sense to me. Well, I think there is a penological explanation for why they're doing it, which is the internet and the explosion of broadband access has made it really easy to obtain this stuff. Much easier than it was 20 years ago. It's everywhere. A guy in a trailer home in Billings, Montana, can go to a store, buy a bunch of computers, and hold over 400,000 images, and he sends them around the world. That's what this guy did in a trailer home. Why don't we stop him from getting it to begin with? The way that we've gone about stopping it, one of the ways is if you're caught with it, you'll be punished heavily. That doesn't work, does it? Well, that's for Congress to decide. I'm asking you, it doesn't work. I think it does work. At the margin. Don't hide under the cloak of Congress. Congress didn't sit down and decide all this. They expressed a value judgment. Congress. Name me a person in Congress. All of them. All of them. I mean, everyone who's voted for this, which is probably an overwhelming majority. And they created mandatory minimums of 10 years. And he committed... Very few people campaign in being in favor of reducing sentences for child pornography. That's true. That's true. But that's society's expression of its values. It's perfectly legitimate for society to express its values through the criminal law. We think these offenses are more serious and we want to punish them more heavily than others. We're not disputing that. They are serious sentences. And they're abominable sentences. You know, and they're widespread in our society. And they've always been widespread in our society. In all levels of our society. I mean, that's a big problem that humankind has had. I understand. Thousands and thousands of years. I understand. But then the question is, why is this reasonable? A man this age, he didn't produce this stuff, did he? He distributed it. Well, you see, you're not answering my question. No, he is far... No, no, but still... Did he make any money off of any of it? He puts it on chat rooms that PSR recounts his... Did he make any money? Well, you asked the judge's question. I don't know that he made any money. No, nothing in the record. Very evasive. We ask you a question and you answer something else. But you've had experience as a law clerk. You know judges want to get their question answered. So he made no money, as far as you know. He made no money, as far as I know. So this was a... And he gets how many years? You know, I hate the way of putting it in months. Because that just makes it seem trivial. How many years was it? It's 240 plus 60. So it's 25 years. 25 years. And so he'll be 69, 89 when he gets out. If he had received 10 years, it wouldn't surprise me if Mr. Merchant would say that that was too long as well. No, he's not saying it. I'm saying it. That 10 years is too long? I'm looking at, as a reasonable jurist, what I think any civilized person would think was appropriate. Now, you'll have to come up and defend this. I don't blame you for that. But it's a tough... You're in a tough position. But your honor... No, don't say your honor. I'm sorry for you. I appreciate that. But you had a case, United States v. Chair. I know you didn't like that sentence. And I know... And I dissented in it. And you explained. And some of your reasoning has been widely circulated. And but... And you remember in that case, somebody rapes a woman on an Indian reservation. They get seven years. Somebody engages in chant with an FBI agent. And they get something like 25 years. I am... Ridiculous world. And it all results, I will tell you, from residual puritanism. We've given up in a great many areas on puritanism. But the Americans can't give it up. And so we really stick it to the people who are still on the fringe here. And I can imagine in 20 years, this will all go away too. But I don't know about that. But it's... Anyway, it's a residual puritanism that you're fighting to have these very harsh sentences. If it were death, I'm sure you'd be up here defending that. Well, as the court recognized, I have to defend the sentence. The only point I wanted to make, your honor, is that I very much appreciate your opinion. And Chair, it was a dissent. In terms of the severity of the sanction, it's very similar. We could have cited that case in our brief as an example of why this sentence is reasonable. If there's nothing further... See, we have a lot of things in the sentencing guidelines that you get used to after a while. And which are outrageous, I think. If someone comes in, pleads guilty, and goes to trial, and they're found guilty, they get a more severe sentence, right? I mean, that's what they do. If they go to trial. Yeah. I mean, if you wait too long to plead guilty, then you get a little longer sentence too, right? Because you put the government to work and all that. Mr. Wood? All our constitutional guarantees, you know. I mean, I never... I was on the district court for, it seemed like a long time when I was young, 12 years. Yeah, 12 years. And I never found the jury trial to be onerous. It didn't take too long. You give them a trial, let them put on their evidence, and instruct the jury. Most of them you can do in two days or a day and a half. You start early, you can do it in a day. Any... But now we punish people for exercising their constitutional rights under the sentencing guidelines. I guess you have to defend the government's position in this case, but you don't have to defend the government for everything it does. Sure. Sure. I would say this, Your Honor. I was making a little speech to educate the American public. At my expense. No, no. We like you. I mean, you're doing a good job. If any of you were on the district court bench, everything that you've said to me, questions, speeches, otherwise, a district court could say after Booker and support a sentence less than 300 months, and it's going to be upheld as reasonable. In fact, there hasn't been a single sentence struck down as reasonable since Booker in this circuit, as unreasonable. You might be in for a surprise. Well, I hope I'm not, because here's the reality. I don't know how here, this sentence... You know why that's probably true? Because you've already written the opinion. Oh, no. There's no one around anymore that remembers what the job of a district judge was like. But it's not... So when I got on the district court in L.A., we took a picture, and all of them are gone except two. Me, who was a junior, and Manny Real. The rest of them are gone. So the people that have come on, they never had this opportunity to think about themselves as having to decide what is a fair and just sentence. They just use this crutch, and then they make their ruling, and then it's fine, you know? But it is not... The current regime is not the same as pre-guidelines. Judge Siebel had to calculate the guidelines. He had to consider their advice. He can disagree with it, or he can find it reasonable as long as he goes through the other factors. And he did. This was the most prolific collector he had seen. And we have a lot of child pornography cases, for whatever reason. And if this is the most prolific, his range went up to 327. I'm not saying the range is some talisman, and you have to follow it. Not at all. But what he's trying to achieve here is some type of justice, given the biggest collector he has. And if he had been any younger, he would have... That other person would have received at least this much, if not more. And it is not fair for him to get the minimum, which is what Mr. Merchant is arguing for now. It's not fair to some person who's younger. And in fact, age was even a discouraged factor earlier, when the guidelines were binding. I don't... I am happy to take... ...this particular sentence? No, this defendant. All right. I'll be back to talk to you later on a different case. I will make sure to answer your questions very directly. You've used up your time on both the cases. I have. If you want to submit Boulet on the briefs, you can do that. Go ahead. Just in terms of dating the court, you're getting the court as existed at the end of the Carter era and the beginning of the Reagan era. So it's really a time warp that you're... Welcome. Three quick points, if I may, remaining to mention. You, Justice Craigerson, asked to name a name. I give you Tom Foley, the ex-congressman out of Florida who voted for the SORNA, the Adam Walsh Act, and these increased guidelines. And we know what happened to Mr. Foley. Mr. Wolf said that all of the cases are pre... That the obstruction didn't count were pre-arrest or pre... That's not true. Teta. Teta is a great example. Teta made his first appearance. Was told by the court, you need to go up to Minnesota. You need to be there on a certain date. He didn't show up. So there was a judicial proceeding that said, these are the ramifications. The last, Your Honors, with the reasonableness argument, Bliss. Look at Bliss. Bliss had five hands-on events with his eight or nine-year-old niece. And he only got 264 months. He got three years less than Mr. Williams. And Mr. Bliss was... Say that again. Mr. Bliss, who had fought... He had been convicted of transporting the minor across state lines. Use of the minor in the creation of the child pornography. And then possession of child pornography. Got 264 months. Three years less than Mr. Williams. Is that a reported case? It is, Your Honor. And again, Bliss is found at 430, Fed Third, 640. And that's a Second Circuit case from the year 2000. But your theory of the child pornography laws is that because of people who buy it and watch it and pick it up on the internet, many, many, many children are being abused. And that's what the district court recited when he gave this sentence. Yes. Judge Siebel did say that. And I cannot dispute that every time a picture is shown... It's hard to tell a sentence. It's hard to tell a sentence. In the pantheon of badness, I would have to... I would argue to any judicial body that the people who create this are worse. No question like that. And Mr. Bliss was that person. Mr. Williams was not.  He's a consumer. Yes, he was, Your Honor. There's no demand, you know. But as Mr. Wolf conceded, that this is becoming more and more and more every day. Yeah, there's currently very high demand. Thank you, Your Honors. Tragedy, yeah. Letters submitted. We'll come to the next case, U.S. v. Carl Lindstrom.
judges: Pregerson, Canby, Noonan